LEE THOMAS, ALIAS HENRY WHITEHEAD, v. THE STATE.

*No. 866. Decided November 28.*

1. **Murder—Defendant as Witness—Compelling Him to Exhibit Wounds on His Person.**—On a trial for murder to which there were no eye-witnesses, after defendant, as a witness in his own behalf, had testified that deceased had drawn and leveled a pistol upon him, which he knocked down, and the shot struck him in the left leg, making a wound, the scar of which he exhibited to the jury, he was asked,

on cross-examination, if he had not shown said scar to certain parties before the killing, which he denied, saying that the scar he had shown them was on his right leg; whereupon the prosecution requested defendant to exhibit both legs to inspection by a physician, which request the court, on objection, refused, but stated that State's counsel would be permitted to request the defendant to exhibit his legs to the jury; and thereupon defendant submitted, under protest, to an examination by physicians, and they were permitted, over his objections, to testify in regard to the same. *Held:* 1. A defendant, as a witness, is bound to answer all legal questions, whether germain to the examination in chief or not. 2. The State had the right to make the request that he exhibit his right leg for inspection after he had exhibited his left leg, and having the right to make such request, there was nothing wrong in his subjecting his legs to examination by the physicians.

2. Same—Argument of Counsel.—On a trial for murder, where there was evidence showing that defendant killed deceased while he was asleep in bed, for purposes of robbery, *Held*, that it was not error for the district attorney to state, in his argument to the jury: "The defendant murdered F. while he was asleep in bed, and after brutally killing him with an axe, the defendant robbed him of his money, his clothes, his horse and buggy, and he should suffer the death penalty for his crime."

3. Same.—Where defendant, as a witness, had stated that deceased had shot him, and the prosecuting attorney in his closing argument stated that the deputy sheriff who had brought defendant to jail, and the jailer who had been with and around defendant, had never seen any holes in his clothing caused by deceased's pistol, and that it was not true that he had been shot, and that defendant had not called said officers as witnesses, because they would not swear to such fact, *Held*, the remarks were proper and the conclusions legitimate.

4. Murder—Evidence—Inculpatory Facts.—On a trial for murder, where there were no eye-witnesses, it was clearly admissible to prove blood-spots were seen upon the floor of the house in which defendant had been living prior to the killing, and that there was also found in said house a pair of pants, upon which, and the suspenders attached to them, there were found spots supposed to be blood and brains.

5. Same—Charge—Lesser Degrees.—Where the evidence established a deliberate murder or nothing, it is not error to refuse instructions upon lesser degrees of homicide.

6. Witness—Rule.—Where the rule has been invoked as to the witnesses, *Held*, not an abuse of discretion on the part of the court to permit a witness who was not put under the rule, and was in the court room and heard the testimony of the other witnesses, to testify that he had examined the pants of defendant just after his arrest, and that he saw no bullet hole in the leg of said pants.

7. Evidence as to Character of Defendant.—On a trial for murder, the defendant, who had resided in Texas but two years, put his character in evidence: *Held*, that it was admissible for the State to prove, by witnesses who knew him in Alabama up to three years ago, that his real name was Henry Whitehead, and that his reputation as a peaceable and law-abiding citizen in Alabama was not good.

8. Argument of Counsel—Belief of Defendant's Guilt.—While it is improper for the prosecuting attorney to state to the jury that he believes the defendant guilty, and that he ought to be hanged, it will not afford ground for reversal when there is cogent testimony that deceased was asleep when killed, and that the murder was committed for the purpose of obtaining his property.

9. Murder—Evidence Sufficient.—See facts stated which are, though the evidence is circumstantial, *Held*, amply sufficient to support a verdict and judgment of conviction for murder in the first degree, with the death penalty.

APPEAL from the District Court of Navarro.   Tried below before Hon. RUFUS HARDY.

Appellant was indicted for the murder of J. M. Farley, in Navarro County, on the 11th day of November, 1893.   His trial resulted in his conviction of murder of the first degree, the penalty being assessed at death.

The facts proved for the State were, substantially, that the deceased, J. M. Farley, had been picking cotton for the defendant during the second week of November.   Defendant lived in a little log cabin, 14x16 feet, on the premises rented by him.   During the time deceased worked for him, defendant's wife would stay at night at some neighbor's, because there was only one bed in the house, and defendant and deceased slept in this bed.   When deceased came to work for defendant he had a horse and buggy, a double-barrel shotgun, and his wearing apparel, among which latter was a pair of striped or checked pantaloons.   It was also proved that deceased was a man who always had some money. Defendant had tried to purchase deceased's horse and buggy.   Deceased disappeared, and was never seen alive after the evening of November 10, 1893.   That night, about 12 o'clock, defendant went to the house of a neighbor, where his wife had gone to stay all night, and having waked her up, told her that he had bought the horse and buggy from deceased for $40, and to dress herself and they would start right away for Corsicana, which was twenty miles distant, that they might attend a circus performance which was to be given there the next day. They started off in the buggy and went several miles to a neighbor's, where they spent several hours resting, until daylight, and the next morning went on to town and attended the circus.   After his return from Corsicana defendant moved all of his things from the cabin, without having occupied it again, to another house on the same tract of land.   There was blood upon one of the pillow-cases and some of the other bed-clothing.   During the interval from the disappearance of the deceased to the time of the finding of his body, which was about a month, defendant claimed to have purchased the horse and buggy for $40.   He was also seen wearing the checked pants above mentioned, which had belonged to deceased.   Defendant also went to a negro woman, with whom deceased had left some clothing to be washed on the day before his disappearance (10th of November), about three weeks afterwards, and told her, "That man wrote to me to get those clothes you washed," but she did not let him have them.   And on the day when defendant was arrested, at Kerens, which was after the dead body of deceased had been found, he had the deceased's valise in his wagon, which he said he had brought to ship by rail to him.   On the 10th day of December, a month after the disappearance of deceased, his body was found in a ravine about 200 yards from the house where defendant lived, and in which he and defendant had been sleeping.

He had on no clothing except his drawers and shirt. His skull had been crushed in in two places, as if from blows from a blunt instrument. Defendant had borrowed a neighbor's axe a short time before, and the wounds appeared to have been made with an axe. The body had been covered with dirt in the ravine, but portions of it had become uncovered, and the hovering of buzzards over the spot occasioned its discovery. After it was discovered, the log cabin in which the parties had slept was searched, and over the spot where the bed had stood, where the parties had slept, splotches of blood and particles of brain matter were found upon the walls. There were also blood-splotches upon the floor; and in one place, where there was a large blood-splotch, the planks were taken up, and underneath the floor, on the ground, was found a puddle of dried blood made by the blood running through the cracks of the floor. There was also found underneath the house, stuffed away between the sleepers and the floor, bloody clothing which had belonged to deceased. On the back of the pants down to the seat, and on the suspenders, there were blood-stains and brains sticking to them. There were also blood-spots upon the sill of the door. There was also found, sticking in a hole in the wall of the house, a bloody rag which appeared to have been used in mopping up blood-stains. Parts of the bloody flooring which contained some of the blood-spots were sawed off, and together with the clothing found under the floor were produced at the trial and allowed to be put in evidence, over objections of defendant.

Defendant, for himself, testified, substantially, that J. M. Farley, the deceased, came to his house, with horse, buggy, gun, etc., and got a job of cotton picking. The next day he proposed to sell his horse, buggy, and gun to defendant for $55, and defendant communicated this fact to H. A. Rachel and T. J. Murchison, and on November 8th defendant worked deceased's horse to Kerens and sold a bale of cotton to Wm. Noble, intending to purchase the horse, buggy, and gun. On the night of November 10th defendant and deceased were playing poker, and defendant had been successful and won nearly all of deceased's money, when on the last hand deceased bet all of his money that had not been lost before, and when the deceased showed his hand he had six cards. Defendant stated that deceased could not have the money, as he was cheating. Whereupon deceased drew a pistol and presented it cocked in the face of defendant. Defendant jumped to his feet and clutched the pistol, which went off, shooting defendant through the left leg just above the knee, making only a slight flesh wound. Defendant and deceased then struggled over the pistol, which had fallen to the floor, when deceased jumped to the side of the house and was picking up his shotgun, when defendant struck him with a piece of cottonwood rail, and delivered a second blow in quick succession, which killed deceased.

One of the errors complained of at the trial was, that the court compelled the defendant to give evidence against himself. The facts pertaining to this matter are substantially as follows:

The defendant testified in his own behalf, and stated that deceased had shot him in the left leg, and that he killed Farley in self-defense; and in support of this statement he offered his pants and drawers, with a bullet hole through each above the knee, and he also exhibited to the jury his left leg, showing a scar about two inches above the knee made by a bullet, and was corroborated by the statement of T. J. Murchison, for the State, that on the Tuesday after the homicide the defendant could not work on account of his leg. Peter Vaughn, testified to the same fact, while Mack Hughes and Jim Alexander testified to seeing the wound before it was healed, while defendant was in jail. The State asked if he had not told Henry Pennick and Will Perkins, before the homicide, that he had been in a shooting scrape in Alabama and had been shot in the leg. Defendant replied that it was possible he had, but that he did not tell them he was shot in the left leg; that the wounds received in Alabama were in the right leg. The State then demanded that he exhibit his right leg to the jury, to which counsel for defendant objected, and the State then demanded that he allow the physicians to examine his right leg (they had previously examined his left leg), and this he refused to do, upon advice of counsel. When the State insisted, the jury were taken from the room until counsel for defendant could be heard, and after his remarks were closed the jury returned, and the court stated that he would not compel the defendant to exhibit his right leg, but that he would allow the State to ask him to do so, and let him refuse to answer, and the jury could consider his refusal. Whereupon, under protest, he submitted to an examination by Drs. Johnson and Miller, who were then allowed, over objections of defendant, to testify as to the nature of the scars upon defendant's right leg, and give their opinion as to the comparative ages and causes of said wounds upon each leg.

The arguments of the prosecuting attorneys were also excepted to and assigned as error. The arguments embraced in these exceptions are as follows:

James Kimball, district attorney, in opening the case for the State, made use of the following language: "This defendant murdered J. M. Farley while he was asleep in bed, and after brutally killing him with an axe, the defendant robbed him of his money, his clothes, his horse, and his buggy, and he should suffer the death penalty for his crime." This argument was objected to at the time, because there was no evidence to sustain the same, and no proof that any such act had been committed by defendant, and the remarks were highly prejudicial to defendant, and the court refused to stop the attorney in his harangue, and would not charge the jury to disregard the same. And Richard

Mays, in closing for the State, used the following language: "This defendant has committed a brutal murder; he killed poor Farley while he (Farley) was asleep, and then robbed him of all he had. Horse, buggy, money, and even the clothes the poor man had on were stolen by the defendant. And you, gentlemen of the jury, should assess the death penalty against the defendant as a just and righteous reward for his cowardly and dastardly crime. It is true the good citizens of Rural Shade had been incensed and had tried to mob defendant at the time he was arrested, but the officers of the law had calmed and quieted them, and prevented the hanging; but now it is the duty of the jury to hang defendant, as he deserves." This argument was excepted to at the time, because there was no evidence that Farley had been killed while asleep, or that he had been robbed at any time, and two grand juries had been impanelled and no indictment for robbery found, and the entire argument was unfair, inflammatory, and prejudicial to defendant. The court did not restrain the county attorney in his argument, but remarked that it was a fair inference from the evidence, and refused to charge the jury to disregard same; and the county attorney again stated that D. A. De Witt, deputy sheriff, had brought defendant from Kerens to Corsicana, and that he and the jailer, A. M. Willis, had been with defendant and around him, and had examined him, and had never seen any holes in the pants or drawers of defendant caused by Farley's pistol, and that De Witt and Willis had never seen the wound in his leg, and it was not true; that defendant would not use the jailer and deputy sheriff as witnesses, because they would not swear he had been shot. This statement was objected to, because there was no evidence to sustain same, and the argument was prejudicial to defendant.

Defendant proved, that since he lived in Texas (about two years) his character had been that of a peaceable and law-abiding citizen. And the State was allowed to prove, over his objections, by James Bryant, a former resident of Alabama, that he had known the defendant for years in Alabama, up to the time of his removal to Texas, and that his reputation as a peaceable and law-abiding citizen in Alabama was bad, and that his true name was Henry Whitehead.

In the charge to the jury the court only submitted the issues of murder in the first degree and self-defense. Defendant's requested instruction on murder in the second degree was refused.

*Ballew & Ballew*, for appellant.—We present and rely upon five distinct grounds for reversal: (1) The failure and refusal of the court to charge upon the law of murder in the second degree, manslaughter, and reasonable doubt. (2) The admission of the testimony of James Bryant. (3) The improper remarks of counsel. (4) The forced examination of the defendant. (5) The insufficiency of the evidence.

The court should charge both degrees of murder in all cases, and leave it to the jury to determine for themselves the degree of guilt; and the jury should also be instructed upon reasonable doubt, as between the first and second degrees of murder.   Blocker v. The State, 27 Texas Crim. App., 16; Farrer v. The State, 42 Texas, 272; McLaughlin v. The State, 10 Texas Crim. App., 361; Penal Code, arts. 606, 607; Moore v. The State, 15 Texas Crim. App., 1; Burkhard v. The State, 18 Texas Crim. App., 621; Murray v. The State, 1 Texas Crim. App., 417; Monroe v. The State, 23 Texas, 210; Villareal v. The State, 26 Texas, 107; Guagando v. The State, 41 Texas, 634.

The court erred in allowing Richard Mays, county attorney, to make an inflammatory speech, over objection of defendant and unrestrained by the court.   The remarks are found in bill of exceptions.

The court erred in not restraining James Kimball, district attorney, in his opening speech, and in not charging the jury to disregard his remarks made over the objection of defendant.

The argument of counsel must be confined to the legitimate evidence, and when the State's attorneys abandon the record and indulge in highly inflammatory remarks and in improper argument, the court should restrain such conduct and charge the jury to disregard same, and a failure so to do is reversible error.

The court erred in allowing the witness James Bryant to testify as to the character of defendant as a peaceable and law-abiding citizen in Alabama several years before he came to Texas, and long prior to the homicide.

The State can not put the character of a defendant in evidence and prove that he has not been a peaceable and law-abiding citizen in another State, and long prior to the arrival of defendant in Texas.

The court erred in compelling defendant to submit his right leg to the inspection of physicians, and in allowing said physicians to state that the wounds in the right leg were fresher than the wounds in the left leg.

No person shall be compelled to be a witness against himself, and the court has no power to compel a witness to compulsory examination.

The court has not the power to compel a compulsory examination of defendant, nor has the court the right to compel a defendant to give evidence against himself.   The wounds upon the right leg of defendant were not an issue in the trial of the case.   The wound in the left leg had been exhibited to the jury and also to the physicians, who testified before the jury concerning the same; but the wounds in the right leg were not admissible to prove anything against defendant, and any questions relative thereto were improper before the jury.   The sole object of this testimony was to prove to the jury that defendant had been in other difficulties, and by forcing him to expose his person or refuse to do so, to corroborate the witness James Bryant as to defend-

ant's former character as a peaceable and law-abiding citizen. The object was not to arrive at the nature and cause of the wound in the left leg, because that had been exhibited, exposed, and testified to, but the State sought in this manner to corroborate the witness James Bryant, and discredit the testimony in defendant's behalf as to his peaceable and law-abiding character, and he was thus compelled to testify against himself, or refuse to testify and let the jury draw their own inference from his silence. This was in direct violation of the constitutional guarantee to defendant, and the cause should be reversed for this alone. We respectfully request the Court of Appeals to decide this question separately, as it is of great importance to the people at large.

We submit that there was no evidence of express malice proven, and that the verdict is not supported by the evidence, and that the evidence is insufficient to support a verdict of murder in any degree.

*R. L. Henry,* Assistant Attorney-General, for the State.—1. The first complaint is, that the court should have charged on murder in the second degree. According to the testimony this was either murder in the first degree or self-defense. The State's evidence made it murder in the first degree, if murder at all; and the defendant took the stand and made the case one of self-defense, if his statements were true. He must be held to his theory of the case. Willson's Crim. Stats., sec. 1060; Maxwell v. The State, 31 Texas Crim. Rep., 119 (in point).

The objection to the language of Richard Mays, county attorney, is not tenable. His language was a proper argument applied to the evidence. His language was literally true and fully warranted by the testimony. No authority is needed.

2. The same proposition applies to Kimball's argument.

3. In answer to bill of exceptions number 1, it is stated that appellant took the stand in his own behalf. When he did so he was subject to be crossed as any other witness. The State contends that he could be required to show his leg, or any wound, or any part of his person. He voluntarily took the stand, and he could not choose to testify to what suited him or show any part of his person that suited him, and withhold the balance. When he went upon the stand voluntarily he waived all rights as to testifying against himself, and could be forced to tell anything material to the issues involved. But the court would not compel him to show his leg. The court only permitted the fact to go to the jury that he refused to show the wound. Quintana v. The State, 29 Texas Crim. App., 405.

4. The same authority applies to bill number 2.

5. The court in its discretion had the right to permit the witness Anderson to testify, notwithstanding he had been placed under the rule. Willson's Crim. Stats., sec. 2318.

Appellant has confessed the killing. All the facts show the homicide to be a brutal murder for the purpose of robbery. Appellant has been deprived of no right.

HURT, PRESIDING JUDGE.—Appellant was charged by indictment with the murder of J. M. Farley. The trial resulted in a conviction for murder in the first degree, with the death penalty assessed. Judgment accordingly, from which appellant prosecutes this appeal.

If the State's theory of the case be true, appellant is guilty of a deliberate murder for the purpose of acquiring possession of and converting to his own use the property of deceased, and perhaps robbery. If that of defendant be true, the homicide was in self-defense. There is no murder in the second degree in this case. The theory of the State is supported by a chain of circumstances leading with almost absolute certainty to the conclusion of guilt.

The defendant was a witness in the case, and his defense depends almost entirely upon his own evidence, which is only very slightly supported by any other.

Defendant's version of the facts attending the homicide, condensed, is as follows: "I knew J. M. Farley. He came to my house on the 6th of November, 1893, and picked cotton for me. Farley is now dead. I killed him. That night I bought his horse and buggy and gun and saddle for $55, and I paid him. We then got into a game of cards, poker. He and I were alone in the house. My wife was over at Rachall's, staying there that night. I had won nearly all of Farley's money that I had given him for his things. On the last hand he put up all the money he had left, about $8 or $10. When I called he showed his hand, and he had six cards and a winning hand. I then put my hand on the money and told him he could not take the money; that he was cheating and had too many cards. Farley then jerked out a pistol and threw it down on me, in my face. I grabbed at the pistol and knocked it down, and he shot me in the left leg. The pistol fell on the floor. I had just about gotten up out of my seat when I knocked the pistol out of his hand. Just about this time Farley jumped and grabbed his double-barrel shotgun, which was loaded, and as he was stooping down to pick it up I snatched a piece of cottonwood rail and struck him twice on the head, and killed him." While on the stand, in corroboration of his testimony, he exhibited his left leg to the court and jury, which contained a scar about four inches above the knee, and about two and one-half inches apart; the bullet appeared to have gone at an angle of about thirty degrees.

On cross-examination, defendant was asked if he had not exhibited that scar to certain parties before the killing. He said no, but that he had shown them a scar on the right leg. The State requested the defendant to submit the wounds on both the right and left legs to an ex-

amination by a physician. Counsel for defendant objected, and the jury were retired. After hearing the objections of counsel for defendant, the court sustained the same, but stated to the counsel that he would permit State's counsel, in the presence of the jury, to ask defendant to exhibit his leg, and if he refused to do so that his refusal would be permitted to go the jury in connection with his other testimony; and thereupon defendant, under protest, permitted an inspection and examination by physicians, and the physicians were permitted, over objection of defendant, to testify in regard to the same.

A defendant voluntarily assuming the position of a witness is bound to answer all legal questions, whether germain to the examination in chief or not. Had the State the right to ask him to exhibit the wound on his right leg? Had the defendant, in corroboration of his statement, the right to exhibit the wound on his left leg? We think he had. If so, we think the State had the right to make its request. If the State had no right to make such a request, the fact that the defendant refused to comply could not be used against him. Having the right to make such request, there was nothing wrong in defendant's subjecting his legs to an examination of the physicians.

Bill of exceptions number 3. There was a great deal of proof that defendant killed deceased while he was in bed asleep, and that it was for the purpose of robbery. The remarks of the district attorney were not improper. These were his conclusions from the facts, which were very well sustained by the circumstances. .

Bill of exceptions number 4. The remarks of the district attorney were proper, and his conclusions were logical.

Bill of exception number 5. The facts proven, complained of in this bill, were of the first importance under the circumstances of this case.

Bill of exceptions number 6. As above stated, there was no murder in the second degree in this case; neither was there manslaughter. It was a cool, deliberate murder, or nothing.

Bill of exceptions number 7. The witness Anderson had not been placed under the rule. Notwithstanding this, the court permitted the State to prove by him that he examined the pants ·of defendant at Kerens just after his arrest, and that he saw no hole in the leg of his pants caused by a pistol shot. There was no abuse of discretion by the court in regard to this matter.

Bill of exceptions number 8. Defendant had been in Texas but two years. He put his character in evidence. The State, over objections of the defendant, proved by James Bryant, that up to about three years ago, in Alabama, he had known the defendant; that he knew his general reputation as a peaceable and law-abiding citizen in Alabama up to about three years ago, and that his reputation was not good. In this there was no error.

. Bill of exceptions number 9. We can not reverse a judgment because a prosecuting attorney states to the jury that he believes the defendant guilty and ought to be hanged, though this be improper. There is cogent testimony in the record that deceased was asleep when killed, and that the murder was for the purpose of at least obtaining his property.

The evidence supports the verdict. If the guilt of a party can be established by circumstantial evidence, then this appellant is guilty of a cold, deliberate, premeditated murder for the purpose of obtaining the property of deceased, and in the perpetration of robbery.

The defense is a sham—an afterthought—shown to be such by the acts and declarations of the appellant and all the attending circumstances.

The judgment is affirmed.                    ·

*Affirmed.*

Judges all present and concurring.