### Emilio Cano v. The State.

#### No. 3911. Decided May 27, 1908.

**1.—Murder—Charge of Court—Express Malice.**

Where upon trial for murder the evidence showed that defendant went to the house of deceased, was greeted in a friendly way, and at request of defendant deceased left the house with him and was killed by him within a few moments by means of pistol shots; that defendant was cool and deliberate at the time and the deceased unarmed, etc., the same justified a charge on murder in the first degree.

**2.—Same—Evidence—Declaration of Third Party.**

Where upon trial for murder the State's witness was permitted to say that she did not go out to the scene of the shooting because she was afraid, while inadmissible, was inconsequential, and therefore not reversible error.

Appeal from the District Court of Karnes. Tried below before the Hon. James C. Wilson.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

No brief on file for appellant.

*F. J. McCord,* Assistant Attorney-General, for the State.

RAMSEY, JUDGE.—The appellant was indicted in the District Court of Karnes County for the murder of one Maximo Valdez. On trial he was convicted and his punishment assessed at confinement in the State penitentiary for life. There are only three grounds in appellant's motion for a new trial. These are to the effect, in substance:

First, that the court erred in his charge to the jury in submitting to them the issue of murder in the first degree because there was no evidence or circumstances in the case of express malice and no evidence upon which to base a charge of murder in the first degree, or to sustain a verdict of guilty of murder in the first degree.   Second, that the court erred in permitting the witness, Edwarda Garcia, to testify as to the reason why she did not go to the scene of the shooting immediately after hearing the shots, which reason was that she was afraid she might get killed.   It is claimed that this statement was irrelevant and inadmissible, a mere matter of opinion not made in the presence of appellant and that same was calculated to influence the jury and prejudice them against appellant.   The third ground of the motion was that the verdict of the jury finding appellant guilty of murder in the first degree is contrary to the law and the evidence for, substantially the reasons set out in the first ground of his motion.

The evidence showed that Maximo Valdez lived on the ranch of one Calvert in Karnes County; that on the day of the killing appellant came to Valdez's house at which time the deceased was away from home gathering up some wood.   When he arrived at the house he found Edwarda Garcia, the wife of deceased, Juanna Monguia, her mother, Saledonia Reyna, Pedro Garcia, a brother-in-law of deceased, and Guadalupe Garcia, a sister of deceased's wife.   Soon after his arrival at the house of deceased, he made some inquiry for him and was informed that he was then away from home but would return in a short while.   Appellant remained at the house for some considerable time differently stated by the several witnesses, but approximately an hour or two.   After the arrival of deceased appellant produced a bottle of whisky and practically all the parties in the house, including deceased, drank with him from it. When deceased returned he brought some wood with him and carried it into the house and remained there for a short time talking with appellant.   All the witnesses agree that their conversation and bearing towards each other was entirely friendly.   After some length of time appellant arose and said to Maximo Valdez, the deceased, "I want to talk a few words to you"; that they left the house and went some little distance and no other or further conversation was heard between them by anyone except the statement hereinafter referred to.   The witnesses say that after appellant and Maximo Valdez had stepped out of the house, it was hardly a minute until they heard a gun fire and that there were five shots fired in all, and that these shots came from the immediate direction of where the dead body of Maximo Valdez was subsequently found.   When found by his wife and the other witnesses, deceased was lying on his stomach.   There was one wound in his breast, his body was powder burned and there was another wound at the back of his head.   In all there were at least three wounds on his body.   It was shown that Valdez had no weapons, no rifle, gun, pistol or bowie knife; that he had a small pocket-knife in his pocket.   It was shown by the testimony of Edwarda Garcia that while the shooting was going on she

heard, as she believed, the voice of appellant and that it was he who made this remark: "I intended to kill you"; that this statement was made about the time the shooting was going on. On cross-examination she stated, in substance, that she was not particularly well acquainted with the voice of appellant and based her statement that he used the language above quoted, to some extent, upon the fact that appellant had just left the house with deceased and there was, so far as she knew, or believed no one else present or about where her husband was, who could have used such language. All the other witnesses substantially confirm the testimony of the wife of deceasd and while there was some unimportant variations, their testimony is all to the same effect. The testimony indicated that the killing occurred near sundown and that in a short time after this appellant went to the house of one Antonio Salies, whose wife was his aunt. When he arrived there he called Antonio from the window and told him that he had shot five times at Maximo Valdez, the deceased. This, according to the testimony, was all he said, nor did he give any reason or excuse or suggest any justification in having done so. He also stated to Antonio Salies that he wanted to surrender and the parties both started off to Karnes City for this purpose. This is substantially the testimony as shown by the record. By the witness, Dan Coleman, the wounds upon the body of the deceased was shown with some detail. One of these wounds being just over the heart, one in the side in the ribs and one in the back of his head. Deceased was shown to have been dressed in common clothing, simply pants and shirt and nothing more. No weapon of any character being found on the body. It was also shown that Maximo Valdez was a man something like 60 years of age and the appellant was shown to be a man 23 or 24 years old. There was no testimony offered by the appellant and his counsel seems to have relied on the weakness of the State's case.

1. We think that the statement of Edwarda Garcia that the reason she did not go out to the scene of the shooting immediately upon hearing the shots because she was afraid she might get killed, was inadmissible, but the statement was so inconsequential and immaterial as not to merit particular attention. It could not, in the nature of things, have influenced the verdict of the jury.

2. The other contention, which is in substance, that the court erred in submitting the issue of murder in the first degree, is more substantial and requires at our hands, as it has received, careful consideration. It should be remembered that there is no criticism of the court's charge but the criticism runs to the effect that the court was not authorized under the testimony in charging on murder in the first degree at all. If this contention is correct, of course, the case should be reversed. If, however, there was evidence from which the conclusion of a murder on express malice was fairly inferable, the court did not err in so charging the jury. It has been held that in every case of murder in the first degree, the existence of express malice must appear and be shown by the evidence. It is said that the character of proof by which the formed

design and express malice is to be discovered and established is, first, the slayer must be of sedate and deliberate mind; he must be sufficiently self-possessed as to comprehend and contemplate the consequences of his acts. His act must not be the result of a sudden, rash, inconsiderate impulse or passion. Second, the design formed must be to kill the deceased or inflict upon him some serious bodily harm. This, it is said, would indicate that the malevolence must be directed towards the deceased as its object. Third, malice of all kinds must be inferred because, it consists in a quality, or state of the mind either actual or imputed. Its actual existence may be manifested by external circumstances from which it may be reasonably inferred. The evidence of such malice must arise from external circumstances discovering that inward intention, as lying in wait, menacings, antecedent former grudges, deliberate compassings and the like, which are various according to variety of circumstances. These external circumstances, indicating the design, may transpire at the time of the killing, as well as before that time. However sudden the killing may be, if the means used and the manner of doing it, or other external circumstances attending it, indicate a sedate mind and formed design to kill, or do great bodily harm, and a murder be committed, it will be upon express malice. McCoy v. State, 25 Texas, 33; Summers v. State, 5 Texas Crim. App., 365. Again it has been often laid down and said that while express malice must be proved and cannot be inferred, still, like other facts, it may be proved by circumstantial evidence. Its actual existence is manifested by external acts and these external acts, or circumstances may transpire before, at the time of, or immediately after the killing. Walker v. State, 14 Texas Crim. App., 609; Jackson v. State, 9 Texas Crim. App., 114; Williams v. State, 15 Texas Crim. App., 104; Thomas v. State, 33 Texas Crim. Rep., 607; King v. State, 34 Texas Crim. Rep., 228. This general rule is established by all the authorities and will not be, we think, seriously questioned or disputed. So the question arises, whether, applying these general principles to the facts in evidence, they raise the issue of express malice. The record shows that deceased was an old man residing with his family some short distance from Karnes City. It does not disclose what, if anything, had been the relations between himself and appellant. Whether these relations had been friendly or otherwise the record does not in terms show. In deceased's absence appellant comes to his house, is received well, and hospitably treated by his family in his absence. On his return he is greeted in a friendly way. The parties drank together. Soon after this is done, at the request of appellant, they leave the house on appellant's statement or suggestion that he desires to see him. Within a very few moments and within a short distance from the house, deceased is killed at the hands of appellant. When arrested appellant states that he had fired five shots at deceased. Deceased was unarmed; there is no evidence of a struggle, no suggestion or excuse made, the murderer was so close to deceased that powder burns are found upon his clothing.

That appellant was of cool and deliberate mind, the testimony abundantly shows; that his conduct of necessity involved a deliberate compassing and a mind to kill deceased, we think evident. The means of murder, three shots, one over the heart, the other in the back of the head, and another in the side —considering the age of the parties and the unarmed condition of deceased—conclusively show, to our mind, as we think it must have been evident to the jury, that the killing was a cold-blooded and deliberate murder. Holding these views, it must follow that we think the court did not err in submitting the issue of murder in the first degree, and that he would have been recreant to every duty incumbent upon him, in the light of this record, if he had failed so to do. So believing, the judgment of the court below is affirmed.

*Affirmed.*